Filed 5/28/26  P. v. White CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D084553 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD274477) |
| JEREMY JONATHAN WHITE, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Daniel B. Goldstein, Judge.  Affirmed; amendment ordered.

Sally Patrone, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Robin Urbanski, Assistant Attorney General, Eric A. Swenson and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

On January 9, 2021 — three days after the riot at the U.S. capitol — defendant Jeremy Jonathan White and several fellow Antifa movement activists traveled from Los Angeles to San Diego to meet local Antifa activists to counterprotest a planned right-wing "Patriot March." Donning full tactical armor and armed with bear spray and a taser, White led Antifa marchers up and down the Pacific Beach boardwalk as many of the Antifa protesters violently confronted right-wing marchers. The scene devolved into a riot and police ultimately declared the Antifa protesters an unlawful assembly.

Over a year later, a San Diego grand jury issued a 29-count indictment alleging that 11 defendants conspired to riot on behalf of Antifa to disrupt the January 9, 2021 political demonstration. Charges included conspiracy to commit the crime of riot (Pen. Code,[1] §§ 182, subd. (a)(1), 404); use of tear gas not in self-defense (§ 22810, subd. (g)); assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)); assault with a stun gun or less lethal weapon (§ 244.5, subd. (b)); assault with a deadly weapon (§ 245, subd. (a)(1)); and taking from lawful custody by means of riot (§ 405a). The indictment alleged coconspirators committed 105 overt acts in furtherance of the conspiracy during 11 incidents.

All but two defendants entered plea bargains, and the case proceeded to a joint trial against only White and codefendant Brian Lightfoot.[2] White was charged with two crimes: conspiracy to riot (count 1), and assault by means likely to produce great bodily injury (count 13 in connection with the

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

[2] Lightfoot is not a party to this appeal. We discuss the case against him only as it relates to White's appeal.

indictment's "Incident 5").[3]  The jury found White guilty of conspiracy and not guilty of assault.  The trial court sentenced White to two years.[4]

On appeal, White contends the trial court committed the following nine errors:  (1) recording custodial conditions in the sentencing minutes that were not orally pronounced at sentencing; (2) denying White's motion for pretrial mental health diversion; (3) barring the defense from referring to victims by inflammatory names; (4) allowing an unqualified police detective to testify as an expert regarding Antifa; (5) denying White's motion for mistrial and dismissal based on discovery and *Brady*[5] disclosure violations; (6) denying White's motion to dismiss for lack of sufficient evidence under section 1118.1; (7) misinstructing the jury regarding the elements of conspiracy; (8) failing to instruct the jury sua sponte that self-defense is a defense to conspiracy to riot; and (9) denying White's motion to remove trial jurors who reported an unsettling encounter with White outside the courthouse during the deliberation stage.

For reasons we explain below, we conclude that other than correcting the trial court's sentencing minutes to reflect the orally pronounced sentence, White's appellate challenges lack merit.  Accordingly, we affirm the judgment with directions to amend the sentencing minutes.

---

[3]    Lightfoot faced 16 charges, including conspiracy to riot, nine counts of using tear gas not in self-defense, four counts of assault by means likely to produce great bodily injury, and one count of assault with a deadly weapon.

[4]    As to Lightfoot, the jury found him guilty of conspiracy to riot, guilty of five counts of using bear spray not in self-defense, and not guilty of assault by means likely to produce great bodily injury.  The jury was unable to reach a verdict on the remaining counts against Lightfoot and the court declared a mistrial on those charges.

[5]    *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Prosecution Evidence

#### 1. Antifa

San Diego Police Detective Emily Clark testified about Antifa and its ideology and tactics. Antifa is a loosely organized political movement that opposes fascism and authoritarianism. Antifa has no formal structure, hierarchy, leadership, or membership. All "it . . . takes to become Antifa" is "a desire and a willingness to be a part of the movement, to hold the ideology." Local Antifa cells organize around the idea of an "affinity group," which is the "concept" of two or more "people coming together over a shared goal or shared ideology." The Antifa ideology opposes right-wing extremists, Nazis, and white supremacists, and looks unfavorably on law enforcement and government.

Militant Antifa activists "use a couple different tactics" to disturb events they oppose: "disruption" and "confrontation." "Disruption is the concept of massing prior to a protest in order to basically present a strong united front to . . . shut down or prevent the other group . . . from protesting and expressing their views." "Confrontation . . . can be broken up in about two different parts." One part "is identification of the person or the group" and "asking challenging questions." "The other part" is "more violent confrontation to get [the adversaries] to leave."

Relatedly, "the concept of self-defense in the Antifa world" is "not exactly" the "traditional concept" of using force to defend against an attack. Instead, it is a "much broader scope" that "authorizes the use of force" and "violence to silence opponents" whose ideologies differ from Antifa's. "They use violence to silence their opponents, basically."

4

Antifa adherents often employ "black bloc," which has two aspects. First, "it is a style of dressing all in black from head to toe," covering as many identifiable features (e.g., skin, hair, tattoos) as possible. This helps prevent identification and allows people to "blend[] into a crowd [that]'s also dressing in black bloc . . . [s]o no one person necessarily really stands out." Second, black bloc refers to "a tactic where a group who's dressed in this way works together at a protest." The attire acts as a "sort of" uniform that helps "members to identify other people that are on their team."

Antifa activists also use the "swarming" technique, which is to vastly outnumber and surround a person they are trying to attack. Swarming in black bloc presents an advantage by "disorienting" the victim.

Antifa has adopted many symbols and slogans. Symbols include a "flag that's kind of a diagonal red and black," where the red represents communism and the black represents anarchy; a red and black flag with the phrase "Antifascist Action"; and the "Iron Front" symbol that consists of three downward arrows. Slogans include the phrases "All Cops Are Bastards" (sometimes referred to by its acronym, "ACAB," or by the corresponding numerical order of each of these letters in the alphabet, "1312"); "No Gods No Masters"; "F[***] Around and Find Out"; "Abolish the Police"; and "Antifascism is Self-defense."

### 2.  The "Patriot March" and Antifa Countermarch

In early January 2021, a 17-year-old supporter of outgoing President Trump posted flyers online advertising a "Patriot March" near the Crystal Pier in Pacific Beach at 2:00 p.m. on January 9, 2021. Antifa activists planned a countermarch for the same day and location.

The evening before the scheduled event, White, Lightfoot, and others communicated through the encrypted "Signal" smartphone messaging app about plans to "squad up" and disrupt the "Patriot March." White, whose Signal username was "ACAB Man" and whose Instagram username was "@theantifasoldier," was one of three administrators for this messaging thread, which they named "SD Fash Bash." Signal was "really the only way [White] like[d] to talk about actions" because "it's . . . encrypted" and "keeps conversation[s] secure." There were no direct communications between White and his coconspirators in this thread.

The group also promoted the Antifa counter action through its Twitter account, "SDAgainstFash." The evening before the event, this account posted that the "main group intends to meet [at specified GPS coordinates] between 12 and 12:30" and "then move to the pier at 12:30" to arrive before the march participants. The Twitter account also posted, "Bloc is recommended, but soft if you're more comfortable in it." Detective Clark explained that "soft bloc" is "another type of clothing where maybe you blend into the general public as opposed to standing out by wearing all black." The account advised that further coordination would occur via Signal. In a Signal discussion about what time the "Patriot March" participants were expected to arrive for their event, White wrote, "I think we're just trying to get there super early to hold space and not let them gather easily."

White and Lightfoot, who both lived in Los Angeles, got a ride to the San Diego meeting point from White's friend, Robert S. During the drive, Lightfoot made video calls to another Antifa activist from Los Angeles (coconspirator Luis Mora) and coordinated their arrival in San Diego. Lightfoot also messaged through social media, "Got team coming from L.A."

6

White arrived in San Diego "kitted up" in black bloc: black clothing, full body armor, a tactical helmet, a tactical vest, a gas mask, and medic patches on his chest and shoulders. White was armed with bear spray,[6] a flashlight-taser, a knife, and scissors.[7] He had three walkie-talkies and gave one to Lightfoot and Robert. White also had a first aid kit and tourniquet.

White's trio walked from their parking lot to the pier with the other group of Antifa activists from Los Angeles. When combined with activists from San Diego, there were initially about 40 to 50 Antifa activists "dressed in all black." The crowd grew to "a couple hundred people." At times, White led the Antifa group on a march up and down the boardwalk waving an Antifa flag as the group chanted "kill all Nazis" and other slogans.

This was the first time law enforcement was aware of Antifa members traveling from Los Angeles to San Diego to protest. It was also the first time Antifa activists openly displayed Antifa flags at a San Diego rally.

Members of the San Diego Police Department's criminal intelligence unit learned ahead of time about the planned march and counterprotest and prepared to deploy extra officers to keep the peace. Undercover officers imbedded themselves in the crowds to gather intelligence. Turnout was much greater than police anticipated and the situation quickly grew out of control.

---

[6] Detective Clark described bear spray as "pepper spray on steroids" — "it's about 10 times stronger than the pepper spray issued to law enforcement officers."

[7] The operative indictment alleges in Overt Act Nos. 11 and 12 that White "gathered black clothing, a gas mask, a tactical helmet, a tactical vest, gloves, and armed himself with a tear gas weapon" and "traveled to Pacific Beach."

We now summarize the trial evidence that pertained to the incidents alleged in the indictment involving White.

### 3. Incident 1[8]

Incident 1 occurred around 1:15 p.m. A line of Antifa members faced off with "Patriot March" participants, separated by a line of police officers. One right-wing marcher had a pendent knife around his neck and another may have had a knife near his waist or pocket. Four unarmed juveniles (H.T., S.G., H.M., and A.F.) were standing near these men. With White about six to 10 feet behind him, Lightfoot sprayed bear spray and hit the four unarmed juveniles. These victims fled and were pursued and beaten by the Antifa members.[9] Lightfoot got bear spray "blowback" in his own eyes, which White treated by rinsing them with water. White admitted at trial that he did not believe these victims posed a threat before Lightfoot sprayed them. Lightfoot likewise acknowledged he "overreacted."

Lightfoot was charged with four counts of using bear spray not in self-defense. The jury was unable to reach a verdict on these counts.

---

[8]    White was nearby when Incident 1 occurred, but he was not charged in connection with it.

[9]    One of the juveniles, A.F., went home for a snack and returned to the protest a while later with a replica BB gun that he discharged into the ground twice "because [he] knew it was loud and that it would make people flee off and stop . . . fighting." The parties stipulated that A.F. was arrested, released to his parents, referred for prosecution, and that the case was closed by the probation department.

8

### 4. Incident 2[10]

Around 1:30 p.m., an unidentified man was walking his service Rottweiler up and down the boardwalk. The man became upset that Antifa marchers were blocking the boardwalk and had knocked a child off a bicycle. The man approached White and verbally argued. When the dog became "a little upset" and barked, its owner pulled its leash to keep the service dog next to him. White sprayed the man and the dog with bear spray and walked away to rejoin the Antifa participants, some of whom were wearing black bloc.

### 5. Incident 3[11]

Around 2:00 p.m., Pacific Beach resident and professional photographer John C. was using his cellphone to livestream the Antifa protesters "screaming at people" and "cops going by." The Antifa group chanted, "All cops are bastards," "F[***] around find out," and "Nazis out of PB."

An Antifa activist confronted John about the filming and knocked the cellphone from John's hand. A verbal conflict ensued. White confronted John and warned, "I've got bear mace. Get the f[***] out, brother." White threatened, "I'll cover you" and began counting down from three. White stuck his hand in front of John's phone and "flipped off the camera."

As the Antifa crowd descended on John, he stepped up onto a park bench and continued livestreaming. A woman in the Antifa crowd held up a

---

10     White was not charged in connection with Incident 2, but he was involved, and it was alleged as Overt Act Nos. 31 and 32.

11     White was not charged in connection with Incident 3, but he was involved, and it was alleged as Overt Act Nos. 33 through 41.

cardboard sign in front of John to block his view of the crowd. Feeling vulnerable, John grabbed the sign and threw it behind him. The woman then knocked John's phone from his hand. John jumped off the bench to retrieve his phone and narrowly avoided being "sucker punch[ed]" by an Antifa member. Another Antifa activist pepper sprayed John in the face.

### 6. Incident 5[12]

Ryan L. is also a professional photographer and Pacific Beach resident. When he saw stories "popping up" on social media about Antifa "starting a bunch of trouble," he grabbed a nine-inch Bowie knife for protection and rode his bike to Mission Boulevard. There, Ryan saw "a couple hundred people . . . dressed all in black with . . . combat gear on . . . being really hostile," throwing plastic and glass bottles at the police. Ryan testified White was "one of the main instigators [of] the whole ordeal."

As the Antifa and "Patriot March" participants assembled on opposite sides of the street, Ryan sat on his bike behind the Antifa crowd, recording with his phone. After a few minutes, about 10 to 12 people from the Antifa group moved toward Ryan. Ryan testified that White "direct[ed]" the crowd toward Ryan. Ryan described the attack: a "couple . . . guys came beelining straight towards me . . . and started trying to attack me. They kicked me off my bike, knocked me to the ground, tased me, and then the whole swarm of people just started attacking me and beating me and hitting me from every angle and direction."

---

[12] White was charged with assault in connection with Incident 5, which also comprises Overt Act Nos. 67 through 76.

While Ryan was being swarmed, John (from Incident 3) came running in and "linebackered into the crowd" to get the Antifa attackers off Ryan.[13] Ryan put his cellphone — still videorecording — in his pocket, got up, and retreated a few feet. An Antifa member swung his skateboard at John's face but missed. Ryan pulled his Bowie knife and took a few steps toward his bike to retrieve it but retreated when someone in the crowd pepper sprayed him. Ryan never lunged or thrusted his knife toward anyone. The crowd moved toward Ryan and John, so they turned and ran.

The Antifa crowd, including White, pursued Ryan and John.[14] As Ryan "was running for [his] life," he turned around and "the tall guy" in "all black military gear" — White — pepper sprayed him. Video footage of the incident taken from some distance away shows White pursuing Ryan and discharging his bear spray between two parked cars. Ryan is not visible when White sprays the bear spray, but the audio recorded by the phone in Ryan's pocket appears to capture a spraying sound around the time he claims White deployed his bear spray near the cars.

As a result of this incident, Ryan sustained a broken elbow, a sprained wrist, and multiple abrasions.

---

[13] John and Ryan knew each other through photography and surfing; they had not coordinated about attending the march.

[14] During this pursuit, Lightfoot hit John in the back with a stick, inflicting a deep muscle contusion. This attack gave rise to Lightfoot's assault with a deadly weapon charge.

### 7. Incident 6[15]

After the Antifa crowd grew out of control and threw bottles, rocks, and eggs at police, the police declared the Antifa crowd an unlawful assembly and directed that group to disperse via specific routes. The declaration was announced repeatedly via motorcycle and helicopter loudspeakers, and undercover officers embedded in the crowd confirmed it could be heard and understood. The "Patriot March" goers were not ordered to disperse because police considered them "peaceful and easy to maintain."

The Antifa crowd did not comply with the dispersal order and continued to throw objects at the police. White was among those who refused to disperse.

### 8. Incident 8[16]

As two apparently unarmed bicyclists rode out of an alley onto Mission Boulevard, they passed by White. White sprayed bear spray at the second bicyclist. The bicyclists were never identified and never filed a police report.

### 9. Coconspirators Debrief

After the Antifa countermarch, White and his coconspirators celebrated their actions in social media and message threads. For example, when someone circulated a video of the Incident 5 attack on Ryan, White responded, "Yeah we f[***]ed his s[***] up."

---

[15]   No charges arose from Incident 6, but it was alleged as Overt Act Nos. 77 through 80.

[16]   White was not charged in connection with Incident 8, but he was involved, and it was alleged as Overt Act Nos. 85 through 91.

In another exchange, White received a message stating, "Stay away from the wacky white supremacists who I'm sure are still reeling." White responded, "We've been handing them their own a[**]es for months. They're starting to not come out as much anymore."

And in a message sent in November 2021, White wrote, "I kinda sorta dressed in a bulletproof antifa supersoldier outfit and fought the cops and White supremacists during the lockdown."

### 10. Arrest and Searches

Piecing together open source social media posts and video footage from the January 9, 2021 riot, Detective Clark identified many of the Antifa participants. Police arrested White on December 2, 2021. A search of his residence and car yielded extensive black bloc material and several cellphones that had been factory-reset to erase all activity.

### B. White's Defense Evidence

White testified in his own defense. At the time of trial, he was 41 years old, six foot three inches tall, and weighed 220 pounds. White was a film industry production designer who participated in political activities. White has attended hundreds of protests.

White sustained several injuries at protests between 2016 and 2019, including having his "back broken in 2019 at a Torrance town hall." White also witnessed other protesters sustain serious injuries. White began wearing "protective gear" to protests to guard against injuries and he wore masks because of COVID-19. White agreed with Detective Clark that the purpose of black bloc is to provide anonymity and avoid detection, but he did not consider his protective gear to be black bloc. He acknowledged, though, that he "looked huge" and "intimidating" in his "intense" gear. And in light of

13

his size, protective gear, and medical patches and equipment, White was "under no pretense that [he] was hard to pick out or anonymous whatsoever."

White characterized Antifa as a "an ideology and . . . a very loosely based group" with no membership, leadership, or hierarchy. Its purpose is "opposing fascism in all its varied and evolved forms." White claimed the only affinity group he was ever a part of was "Med Bloc," who were trained by medical personnel to render aid to protesters at rallies.

The Patriot March was the first time White traveled to San Diego to march with Antifa. He was motivated to attend, in part, by an incident that occurred in Los Angeles on January 6, 2021. During that encounter, far-right protesters became violent toward White's group and made a "declaration of war" against what White perceived as his political side. White did not recall how he learned of the San Diego event but knew he was meeting with Antifa activists. White knew his driver, Robert, but did not really know Lightfoot or the other Los Angeles Antifa activists who traveled separately to the march. When White arrived, people were friendly and happy to see each other. But White later saw people assembling whom he believed were members of "white nationalist groups" like the "American Guard," "Three Percenters," and "Proud Boys," whose members had been violent at previous protests.

During Incident 1, White was six to 10 feet behind the action and did not become involved. He saw white supremacists displaying weapons and chanting, "F[***] Antifa." White saw several people beaten, including juveniles who did not pose any threat, but he did not participate in beating or chasing the victims.

Regarding Incident 2, White testified the Antifa crowd was not obstructing the dog owner on the boardwalk and that the dog owner verbally engaged them with profanity. White tried to calm the situation, but when

14

the dog owner shook the leash and "riled up" the dog, White "deployed a short burst of mace" in self-defense when the dog growled and snapped at White.

As to Incident 3, White acknowledged he was initially aggressive with the photographer but then tried to deescalate the situation. White denied saying "I've got bear mace. Get the f[***] out, brother." He also denied threatening to "cover" John with bear spray, explaining, "I was saying 'I'll cover you' in the sense of . . . keeping the crowd off . . . you." But White had no explanation for why he counted down from three or what would happen when he got to one. When White saw that John was continuing to film the crowd, White flipped off the camera because he believed John was trying to "dox" people by posting their identities online. White said he walked away when the crowd attacked John.

With respect to Incident 5, White testified he did not know at the time how the confrontation with Ryan began because there was already "a huge fight" happening when White first approached. After seeing in court how the incident began, White "completely condemn[ed] what happened." White denied that he pointed out Ryan to the crowd or tried to get him assaulted. Instead, White claimed he "noticed something potentially alarming down the alleyway" behind Ryan and was trying to alert an Antifa protester with a megaphone to warn of a potential ambush from the alley. White pulled out his bear spray during Incident 5 only after he saw a man throw a smoke grenade and heard the crowd chanting "F[***] Antifa." White denied chasing Ryan, assaulting him, tasing him, or pepper spraying him.

Regarding Incident 6, White explained he did not comply with the dispersal order because he did not hear it directly and it was "dangerous to leave . . . on your own" because "there were roving bands of white supremacists armed with knives . . . and also just extrajudicial arrests."

15

White added that he also could not leave because he was not near the two people he had traveled with to the rally.

As for Incident 8 in which White bear sprayed a bicyclist, White testified he "had no recollection of that" and he "heard about it the first time in the courtroom . . . and was shocked."

Two character witnesses — a neighbor/coworker and a friend — testified that White was honest and peaceful.

## C. Jury Verdicts and Sentencing

After deliberating for about eight days, the jury found White guilty of conspiracy to riot and not guilty of assault by means likely to produce great bodily injury.

The trial court sentenced White to the middle term of two years in local jail.

# III. DISCUSSION

## A. The Trial Court Erred by Recording Custodial Conditions in the Sentencing Minutes That Were Not Orally Pronounced at Sentencing

White contends the trial court erred by recording custodial conditions in the court's sentencing minutes that the court did not orally pronounce at sentencing.[17]  We agree this was error.

### 1. Background

At the June 28, 2024 sentencing hearing, the trial court observed that the sentencing triad on White's conspiracy to riot conviction was 16 months/two years/three years.  The court noted it could not impose the upper term because the People elected not to prove-up any aggravating circumstances.  As between the lower term and the middle term, the court concluded that White "deserves the middle term of two years in that he had a leadership position," "he used a weapon," "he caused injury to others," and "he expresses no remorse."  The court indicated the sentence could be served in local jail.  The trial court did not orally pronounce any restrictions on White's custodial sentence.

---

[17]  White's appellate counsel moved to strike this argument from his opening brief, asserting that she learned from White's trial counsel on April 1, 2025, "that a hearing was recently held in this case in the trial court at which several parties and the trial court conferred and recalled the trial court stated there was to be no early release when appellant was sentenced."  The motion also stated, however, that "the reporter's transcripts . . . did not contain the restriction, and [White] did not recall the restriction."  We denied the motion to strike.

On the trial court's sentencing minutes, a box is checked next to the phrase "no early release of any type authorized," and there are handwritten notations stating, "NO CPAC/NO WORK FURLOUGH."[18] The abstract of judgment does not reflect these restrictions.

## 2. Relevant Legal Principles

"In a criminal case, it is the oral pronouncement of sentence that constitutes the judgment." (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1324, italics omitted; see *People v. Mitchell* (2001) 26 Cal.4th 181, 185.) "The clerk cannot supplement the judgment the court actually pronounced by adding a provision to the minute order and the abstract of judgment." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 387–388 (*Zackery*).) "In the event of a discrepancy between the oral pronouncement of judgment and a minute order or an abstract of judgment, the oral pronouncement controls." (*People v. Gobert* (2023) 89 Cal.App.5th 676, 689 (*Gobert*); *People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2 ["The record of the oral pronouncement of the court controls over the clerk's minute order."].)

## 3. Analysis

As the People acknowledge in their respondent's brief, "[t]he reporter's transcript of the sentencing hearing . . . includes no explicit indication that the trial court was foreclosing the possibility of custody-alternative programs or early release." The clerk's sentencing minutes imposing such restrictions therefore conflict with the trial court's oral pronouncement of sentence. (See *Zackery*, *supra*, 147 Cal.App.4th at p. 388 [striking sentencing conditions

---

18    The parties agree that "CPAC" refers to the "County Parole and Alternative Custody Unit."

included in the clerk's minutes that were not orally pronounced].)  "It follows that we must correct the discrepancy by ordering the trial court to modify the minute order."  (*Gobert*, *supra*, 89 Cal.App.5th at p. 689.)

## B.  The Trial Court Acted Within Its Discretion in Denying White's Motion for Pretrial Mental Health Diversion

White contends the trial court erred by denying his motion for pretrial mental health diversion under section 1001.36.  We disagree.

### 1.  Mental Health Diversion Framework

Initially enacted in 2018, section 1001.36 "authorizes a pretrial diversion program for defendants with qualifying mental disorders."  (*People v. Frahs* (2020) 9 Cal.5th 618, 626 (*Frahs*).)  "Diversion allows for the suspension of criminal proceedings and potential dismissal of charges upon successful completion of mental health treatment."  (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 890 (*Sarmiento*); see § 1001.36, subd. (f)(1).)  Specifically, " '[i]f the defendant has performed satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion' and 'the arrest upon which the diversion was based shall be deemed never to have occurred.' "  (*Frahs*, at p. 627, quoting § 1001.36, former subd. (e), now subd. (h).)

To qualify for diversion, a defendant must be "both *eligible* for diversion and *suitable* for the program."  (*Sarmiento*, *supra*, 98 Cal.App.5th at p. 891.)  A defendant is eligible for diversion if two criteria are met.  First, the defendant must be diagnosed with a qualifying mental disorder, defined as a disorder "identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders [(DSM)] . . . , but excluding antisocial

19

personality disorder and pedophilia." (§ 1001.36, subd. (b)(1).) Second, the mental disorder must have been "a significant factor in the commission of the charged offense." (*Id.*, subd. (b)(2).) There is a statutory "presumption that the defendant's diagnosed mental disorder was a significant factor in the commission of the charged crime." (*Sarmiento*, at p. 891; see § 1001.36, subd. (b)(2).) Specifically, "[i]f the defendant has been diagnosed with a mental disorder, the court *shall* find that the defendant's mental disorder was a significant factor in the commission of the offense *unless* there is clear and convincing evidence" to the contrary. (§ 1001.36, subd. (b)(2), italics added.) "If the defendant meets the two enumerated eligibility requirements, 'the court must consider whether the defendant is suitable for pretrial diversion.'" (*People v. Brown* (2024) 101 Cal.App.5th 113, 120, quoting § 1001.36, subd. (c).)

A defendant is suitable for pretrial diversion if four criteria are met: "(1) In the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder . . . would respond to mental health treatment. [¶] (2) The defendant consents to diversion and waives the defendant's right to a speedy trial . . . . [¶] (3) The defendant agrees to comply with treatment as a condition of diversion . . . . [¶] [and] (4) The defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (§ 1001.36, subd. (c)(1)–(4).) A defendant poses an "'unreasonable risk of danger to public safety'" if there is "an unreasonable risk" the defendant will commit a new violent felony, known as a super strike, within the meaning of section 667, subdivision (e)(2)(C)(iv). (§ 1170.18, subd. (c); see *Sarmiento*, *supra*, 98 Cal.App.5th at p. 892.)

"Assuming the defendant is both eligible and suitable, the trial court must also be satisfied 'that the recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment needs of the defendant.' " (*Sarmiento, supra*, 98 Cal.App.5th at p. 892, quoting § 1001.36, subd. (f)(1)(A)(i).)

"Finally, even where defendants make a prima facie showing that they meet all the express statutory requirements, the court may still exercise its discretion to deny diversion.  [Citations.]  But this 'residual' discretion must be exercised ' "consistent with the principles and purpose of the governing law." '  [Citations.]  That purpose includes a strong legislative preference for treatment of mental health disorders because of the benefits of such treatment to both the offending individual and the community.  Where the court chooses to exercise this residual discretion to deny diversion, its statement of reasons should reflect consideration of the underlying purposes of the statute and explain why diversion would not meet those goals." (*Sarmiento, supra*, 98 Cal.App.5th at pp. 892–893.)

" 'Ultimately, . . . diversion under section 1001.36 is discretionary, . . .' and we 'review for abuse of discretion the trial court's decision whether to grant a request for mental health diversion.' " (*People v. Qualkinbush* (2022) 79 Cal.App.5th 879, 887.)  We review the trial court's factual findings for substantial evidence.  (*Negron v. Superior Court* (2021) 70 Cal.App.5th 1007, 1016; see *Qualkinbush*, at p. 887 [" ' "A court abuses its discretion when it . . . bases its decision on express or implied factual findings that are not supported by substantial evidence." ' "].)

## 2. Background

### a. White's Motion

Before trial, White moved for mental health diversion under section 1001.36. He supported his motion with a report from Dr. Martin H. Williams, a forensic psychologist. Dr. Williams based his report on (1) an approximately two-hour videoconference interview of White; (2) the People's opposition filed in this case to White's motion to sever his trial from his codefendants'; (3) documents regarding a settlement between White and the City of Torrance for injuries police inflicted on White during a protest; and (4) summaries of grand jury testimony in this case. Dr. Williams diagnosed White with two conditions identified in the DSM-5: posttraumatic stress disorder (PTSD) and "persistent depressive disorder, with anxious distress, with intermittent major depressive episodes."

Dr. Williams documented that White reported that his father was physically "abusive throughout his childhood," twice requiring White to seek medical treatment. White's "mother was also physically abusive" and imposed "extreme" punishments. In 2016, White and a girlfriend "moved into an RV with the goal of traveling around and doing activism." But the girlfriend physically abused White and defamed him online when he finally left her. White reported that he attempted suicide twice and "was in psychotherapy in high school" and "sporadic[ally] . . . since then." White stated that "for the past seven years, he has devoted himself to political activism, placing it above his regular employment in importance."

Dr. Williams opined that White's PTSD arose from an incident in 2019 in which Torrance police officers severely beat White, breaking his back with a baton. The beating occurred when the mayor ordered police to remove

22

people from a public meeting and White intervened as police were about to hit a woman. "That beating led to PTSD flashbacks and a physical tic." In 2020, "White travelled around the country joining [George Floyd] protests," during which he saw people "lose eyes," "get limb injuries," and "los[e] a finger." Based on sustaining a broken back and witnessing these other injuries, White "decided to create his 'suit of armor' to protect himself." The report noted that at other protests police beat White and shot him with a beanbag gun as he shielded protesters behind him. During his most recent arrest, "about 30 police came to his home to arrest him" around 4:30 a.m. Dr. Williams concluded that these "circumstances would lead to symptoms of PTSD."

Dr. Williams's report included a description of PTSD from "a website published by the National Institute of Mental Health." According to this description, "To be diagnosed with PTSD, an adult must have all of the following for at least 1 month": (1) "At least one re-experiencing symptom," such as flashbacks, bad dreams, or frightening thoughts; (2) "At least one avoidance symptom," like "avoiding thoughts or feelings related to the traumatic event" or "staying away from places, events, or objects that are reminders of the traumatic experience"; (3) "At least two arousal and reactivity symptoms," which include being easily startled, feeling tense, having difficulty sleeping, and having angry outbursts; and (4) "At least two cognition and mood symptoms," such as having trouble remembering key features of the traumatic event, having "negative thoughts about oneself or the world," having "distorted feelings like guilt or blame," and losing interest in enjoyable activities.

"In [his] professional opinion," Dr. Williams concluded that White's wearing a " 'suit of armor,' " "carrying bear spray," and his "role of protecting

23

others as a medic" during protests "was a manifestation of [his] PTSD" and constituted "re-experiencing trauma, even before any violence occurred."

Regarding the mental health diversion criteria, Dr. Williams opined that (1) White was diagnosed with PTSD and suffered from it at the time of the charged offenses; (2) the PTSD "significantly contributed and, in fact, fully accounts for [White]'s role in the charged offense"; (3) White would not pose a risk to public safety if his PTSD was "effectively treated and stabilized"; and (4) White would respond well to treatment. Dr. Williams also warned that any "incarceration for [White] would be extremely dangerous to his well[-]being" and "life threatening."

Dr. Williams did not discuss persistent depressive disorder in connection with the mental health diversion criteria.

### b. The People's Opposition

The People opposed White's motion for mental health diversion and presented a rebuttal report from Dr. Morgan Shaw, a licensed psychologist. In preparing her report, "Dr. Shaw reviewed the same material cited in Dr. Williams'[s] report, with three key additions":  (1) video of White during the Torrance police incident, (2) video of White during the Pacific Beach incident, and (3) portions of a news interview White gave about the Pacific Beach incident.

Dr. Shaw identified several shortcomings in Dr. Williams's PTSD diagnosis. First, Dr. Williams's assessment was conducted over video, "did not include any standardized psychological assessments" that "would have had embedded validity measures," and "did not include any formal risk assessment measure."

24

Second, Dr. Shaw found it "important to highlight that" Dr. Williams relied on a " 'lay description' " of PTSD that identified four diagnostic criteria, whereas the DSM-5 identifies seven criteria.

Third, Dr. Williams cited evidence pertaining to only one diagnostic criterion ("intrusive symptoms of past events" in the form of flashbacks).

Fourth, regarding the DSM-5's diagnostic criterion of "persistent avoidance of stimuli associated with the traumatic events," Dr. Shaw observed that not only was "there . . . absolutely no data provided by Dr. Williams that . . . White avoids stimuli associated with his past trauma, . . . in fact, the data . . . suggest the complete opposite." For example, Dr. Williams reported that White "traveled around the country joining protests." Dr. Shaw also observed that video of the Pacific Beach events showed that White was not avoiding violence, but rather, was "verbally and physically confrontational with passersby or others who [were] not overtly confrontational with him or anyone else in the surrounding area"; was "observed to be running toward violence" and "supportive of the violence occurring around him"; and made social media posts "glorif[ying] . . . past behaviors from the event" and expressing "intentions to continue on with the same behaviors and choices in future events."

Fifth, while Dr. Williams found that certain of White's aggressive behavior during the charged offenses indicated White suffered from PTSD, Dr. Shaw saw White engage in similar conduct in the video from the Torrance incident — *before* "the first reported event that Dr. Williams use[d] to support [the onset] of PTSD."

Sixth, during the charged offenses, White did not exhibit the "reflexive," "heightened startle response or jumpiness" that one would expect from a person with PTSD.

25

Seventh, "nowhere in his report [did] Dr. Williams actually describe the actions or behaviors of . . . White" during the charged offenses that "support . . . the assertion that the commission of the crimes were connected in a meaningful way to . . . White's diagnosis of PTSD."

Eighth, Dr. Shaw explained that White's behavior during the charged offenses was inconsistent with his being in a dissociative state because (1) he was not "curling up and/or 'zoning out,'" as is typical during flashbacks; (2) the charged offenses occurred over the course of several hours, whereas dissociative flashbacks usually last only seconds; and (3) White's own description of the circumstances of the charged offenses in social media posts and his news interview indicated he was aware of his circumstances.

Regarding the persistent depressive disorder diagnosis, Dr. Shaw observed that Dr. Williams "did not connect this diagnosis to the commission of the offenses" and "only related the diagnosis of PTSD to his opinion of . . . White's appropriateness for mental health diversion." Dr. Shaw found it "important" to "highlight that typically individuals with more severe depressive symptoms would lack energy, drive, or motivation to engage in meaningful or social activities, such as political protests, and there is no data to suggest that . . . White's experience of depression was a causal factor for his actions" in connection with the charged offenses.

In sum, Dr. Shaw concluded that White's conduct during the charged offenses was "much more indicative of [his] sociopolitical ideology being the primary motivating force for his actions, which would be inconsistent with the purpose of mental health diversion."

26

## c. The Trial Court's Ruling

After hearing argument from counsel that largely tracked the briefing and expert reports, the trial court denied White's motion for mental health diversion. The court explained why it found "clear and convincing evidence that [PTSD] was not a motivating factor" in White's commission of the charged offenses and why White's conduct was not within the scope of the mental health diversion statutes:

> This is sociopolitical behavior, and at least for this motion, that was the motivating factor along with a certain degree of anger. And that anger is replicated in the . . . social media messages and the defendant's behavior just prior to the event and just after the event and including the event.
>
> He engages in what can only be described as violent behavior, and that is the antithesis, I believe, and I think [Dr. Shaw] correctly points out . . . that that is not the behavior one would engage in when he or she has [PTSD]. It's also not — to me, it's clearly not within the legislative intent of the mental health care diversion statute.
>
> [¶] . . . [¶]
>
> So the defendant is not a good candidate nor would it be appropriate to divert him because of this.
>
> The issue of the defendant's body armor and wearing – and flags, the armor is meant for combat, and he's been to so many protests that, to me, it became a learned behavior. And by wearing that armor, one, he won't get hurt, and two, he conceals his identity which is gonna be an issue during the trial.
>
> So that motion is denied.

27

### 3. Analysis

Preliminarily, we reject the People's argument that White's appeal of the trial court's diversion ruling "should be dismissed as moot because this court cannot grant any relief since [White] has served his sentence."[19] "A case becomes moot when events ' "render[] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him any effect[ive] relief." ' " (*In re D.P.* (2023) 14 Cal.5th 266, 276.) Here, however, we *can* grant relief because if White were to successfully complete mental health diversion, the charges against him would be dismissed and his arrest would "be deemed never to have occurred." (§ 1001.36, subd. (h); see *People v. K.D.* (2025) 110 Cal.App.5th 1, 15 [holding that the appeal from the denial of developmental disability diversion under section 1001.20 et seq. was not moot, even though the defendant had served her full sentence, because "the prejudicial consequences or disadvantageous collateral consequences of [the] defendant's felony . . . conviction could be ameliorated if she were granted developmental disability diversion"].)

Turning to the merits, we conclude substantial evidence supports the trial court's finding by clear and convincing evidence that a qualifying mental health condition "was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense." (§ 1001.36, subd. (b)(2); see *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1079 (*Gerson*) ["The trial court's determination 'whether the defendant's disorder played a

---

19      The People assert in their respondent's brief that they have been "informed by the California Department of Corrections and Rehabilitation . . . that [White] was released from the San Diego County Sheriff's Department on June 23, 2025." The People cite no evidence in the record to support this assertion. (See *People v. Fairbank* (1997) 16 Cal.4th 1223, 1249 ["we cannot consider on appeal evidence that is not in the record"].)

28

significant role in the commission of the charged offense' is 'a quintessential factfinding process' subject to review for substantial evidence."]; *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011 ["When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true."].)

White's motion presented "a proverbial battle of the experts." (*Gerson*, *supra*, 80 Cal.App.5th at p. 1080.) Dr. Williams opined that White's PTSD contributed to his commission of the charged offenses, while Dr. Shaw opined that it did not. The trial court credited Dr. Shaw's opinion over Dr. Williams's. Provided Dr. Shaw's opinion was not based " 'on factors that are "speculative, remote or conjectural," or on "assumptions . . . not supported by the record," ' " her testimony is " 'sufficient to constitute substantial evidence' " (*People v. Wright* (2016) 4 Cal.App.5th 537, 545) and we will not second-guess the trial court's credibility determinations as to the competing expert opinions (see *Gerson*, at pp. 1079-1080; *People v. Poulsom* (2013) 213 Cal.App.4th 501, 518 [" 'if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder' "]; *People v. Oneal* (2021) 64 Cal.App.5th 581, 592–593 ["it generally is not an abuse of discretion for the trial court to give more credit to one expert's opinion than to another's"]). The record shows that Dr. Shaw's opinions were not based on improper or speculative matter.

As recounted in detail above, Dr. Shaw identified several grounds for rejecting Dr. Williams's opinion regarding White's PTSD diagnosis being a contributing factor, including: the limited nature of the evaluation and

materials consulted; the use of a lay description of PTSD that identified only a subset of diagnostic criteria listed in the DSM-5; the examination of only a single diagnostic criterion (flashbacks) and corresponding failure to address the highly relevant avoidance factor; and the failure to address White's specific conduct during the charged offenses. These concerns gave the trial court valid, non-arbitrary reasons to reject Dr. Williams's causation opinion. (See *Gerson*, *supra*, 80 Cal.App.5th at p. 1080 ["the trier of fact generally may reject even uncontradicted testimony, whether by lay or expert witnesses, so long as the rejection is not arbitrary"]; *id.* at p. 1086 [where the prosecution expert's "testimony cast doubt on the competing [defense] diagnosis[,] . . . the trial court's rejection of the competing diagnosis was not arbitrary"].)

Dr. Shaw also identified evidence in the record that supported her affirmative opinion that PTSD was *not* a contributing factor to White's commission of the charged offenses, but rather, that he was motivated by his "sociopolitical ideology." This evidence included: video evidence showing him behaving aggressively even before the Torrance incident that allegedly caused his PTSD; undisputed evidence that White "travelled around the country joining protests" rather than "avoid[ing] stimuli associated with his past trauma"; video evidence of the charged offenses showing that White did not exhibit behaviors one would expect from a person with PTSD, but rather, showed him seeking out violence; and social media posts glorifying past violence and suggesting he intended to engage in future violence. This evidence was sufficient to support the trial court's finding that PTSD was not a contributing factor to White's commission of the charged offenses.

The record also supports the trial court's implied finding that White's persistent depressive disorder was not a contributing factor. Dr. Shaw opined that White's practice of participating in political protests was

30

inconsistent with the behavior typically exhibited by those suffering from severe depressive symptoms.  Notably, Dr. Williams did not offer any opinion on this point.

The cases White cites to support reversal of the trial court are unpersuasive.  Two of the cases are inapplicable because they involved different diversion eligibility and suitability criteria than are at issue here. (See *People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1150 ["only one of the six prongs in section 1001.36, subdivision (b)(1) is at issue, namely subdivision (b)(1)(F)—that the defendant 'will not pose an unreasonable risk of danger to public safety . . . if treated in the community' "]; *Sarmiento*, *supra*, 98 Cal.App.5th at pp. 893–895 [addressing whether the defendant's symptoms would respond to treatment (§ 1001.36, subd. (c)(1)), whether the recommended treatment would meet the defendant's " 'specialized mental health treatment needs' "(§1001.36, subd. (f)(1)(A)(i)), and whether the defendant would "pose[] an unreasonable risk [of danger] to public safety" if treated in the community (§ 1001.36, subd. (c)(4))].)

The remaining case, *Gomez v. Superior Court* (2025) 113 Cal.App.5th 671, found that insufficient evidence supported the trial court's finding on the "significant factor" prong.  (§1001.36, subd. (b)(2).)  The appellate court held the trial court essentially reversed the statutory presumption by basing its finding "on a lack of 'indication [in the police reports] that [the defendant] was suffering from a disorder at the time' of the [charged offense]."  (*Id.* at p. 688.)  The appellate court explained why the trial court's reasoning improperly flipped the presumption:  " '[T]he absence of evidence proving that [a] petitioner's mental disorder *was* a factor in the commission of the offenses is not substantial evidence supporting a finding by clear and convincing evidence that [the] petitioner's mental disorder *was not* a factor in the

31

commission of the offenses.' [Citation.] 'By finding that the statutory presumption had been overcome by the mere *absence of evidence* demonstrating that [a] petitioner's mental illness was a factor in the alleged offenses, [a trial court] effectively shift[s] the burden to [the petitioner] to affirmatively prove that [his, her, or their] mental disorder contributed to the offenses.' " (*Id.* at pp. 688–689.)

*Gomez* is distinguishable because the trial court here did not rely on an absence of evidence to support its finding. Instead, the court relied on the presence of evidence — Dr. Shaw's expert opinion — which constitutes substantial evidence sufficient to overcome the statutory presumption.

## C. The Trial Court Acted Within Its Discretion in Barring the Defense from Referring to the Victims by Inflammatory Names

Defendant argues "the trial court erred by excluding evidence of the political affiliations of the opposing groups at the rally pursuant to Evidence Code section 352." He reasons "the evidence was material and admissible to accurately set the stage of the political rally" and to explain why he wore protective gear. We conclude the trial court acted within its discretion in barring the defense from using inflammatory labels. And, in any event, the trial court allowed the defense to introduce evidence providing sufficient context about tensions between Antifa and certain right-wing groups.

### 1. Background

The People moved in limine "to bar defense counsel from referring to victims as 'Nazis' or 'fascists' or 'white supremacists.' " The People "acknowledge[d] that the victims' apparent and outwardly visible political alignment will be admissible," but reasoned that "anything beyond that will

only be offered as improper and inadmissible character evidence" and would be unduly inflammatory.

At the motion hearing, the prosecutor reiterated that the victims' general political affiliation as supporters of President Trump would "be very obvious and . . . absolutely fair game," but that inflammatory labels or unsubstantiated accusations of affiliation with specific organizations (e.g., Proud Boys or American Guard) was irrelevant and improper character evidence.

Defense counsel countered that the victims "were not . . . Trump flag wavers just innocently out there to wave flags," but were "people [who] scraped it up . . . at other protests." He further argued labels were necessary to provide "the entire context" of how "American Guard hates Antifa" and, therefore, the victims' testimony would be biased.

The prosecutor responded that any affiliation between the victims and certain groups was "far too attenuated," particularly because the attacks on these victims were "unprovoked" and there was no evidence that White "actually kn[e]w anything about these victims at the time of th[e] crime."

Under questioning from the court, defense counsel agreed with the court's observation that the victims did not engage in provocative conduct that would support a self-defense instruction. But he argued the affiliations were relevant to the conspiracy charge because they explained why one codefendant attacked a victim whom the codefendant misidentified as someone he fought at a previous protest. The defense also argued it was relevant to impeach victims who might testify they planned only to attend a peaceful rally.

The trial court granted the People's motion, finding the inflammatory labels were not relevant because no evidence yet supported a self-defense

33

theory and the claims of affiliation were "tenuous." The court also found the evidence would be unduly prejudicial.

Despite the trial court's ruling, evidence and argument regarding the adverse groups were presented at trial. For example, when testifying about one video exhibit, White gave these descriptions of some people: "He's got a Three Percenter shirt on which is an antigovernment authoritarian group. . . . [A]nd then this man here with the checkered shirt, he's got a skull mask, which is generally associated with white supremacist groups. And he's got a visible iron cross tattoo on his right forearm which is from Nazi Germany. [¶] . . . [¶] It was pretty scary to see what by all clues were white supremacists . . . ." White also testified he had seen "firsthand" many times "people with shirts, hats, tattoos of [a Three Percenter] symbol" "commit acts of violence at protests against antifascists." White also testified he traveled to San Diego after encountering violent Proud Boys at the January 6, 2021 rally in Los Angeles and after finding out "there were going to be Nazis in Pacific Beach."

During White's closing argument, his trial counsel repeatedly referred to the extremist groups that Antifa faced during the protest. Counsel stated the Proud Boys, American Guard, and Three Percenters all "commit violence at protests," and he accused "the Proud Boys [of] hijacking the protest." He also said Ryan (the victim in Incident 5) was "wearing Proud Boy colors" and "knew where the Proud Boys were because he was standing with them later." Counsel also argued, "The Proud Boys are out there. They're yelling 'F[***] Antifa,' and they are a real threat, a real threat to antifascist protesters."

34

## 2. Relevant Legal Principles

Under Evidence Code section 352, a trial court may exclude otherwise admissible evidence if the court, "in its discretion," determines that the evidence's "probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice." (Evid. Code, § 352; see *People v. Hin* (2025) 17 Cal.5th 401, 482 (*Hin*).) " 'Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 133.) " ' "In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." ' " (*People v. Powell* (2018) 6 Cal.5th 136, 162–163 (*Powell*).)

" 'An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion.' " (*People v. Miles* (2020) 9 Cal.5th 513, 587.) Under this standard, " ' "[w]e will not disturb a trial court's exercise of discretion under Evidence Code section 352 ' "*except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " ' " (*Id.* at pp. 587–588.)

Evidentiary error under section 352 warrants reversal of the judgment only when "there [is] a reasonable probability of a different outcome . . . absent the error" or when "the error . . . constitute[d] a due process violation

35

that rendered [the] trial fundamentally unfair." (*Hin*, *supra*, 17 Cal.5th at p. 482, citing *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); see *People v. Thomas* (2023) 14 Cal.5th 327, 374 [applying *Watson* to Evid. Code, § 352 error].)

### 3. Analysis

We conclude the trial court acted within its discretion in barring defense counsel from using inflammatory labels to describe the victims. To begin, when the trial court ruled, there was no evidence before the court showing that any of the victims were Nazis, fascists, or white supremacists. Second, even had there been such evidence, there was no evidence that *White knew* that any particular victim was a Nazi, fascist, or white supremacist. Additionally, even if there had been such evidence, we would have little trouble finding the court acted within its discretion in finding those labels unduly prejudicial; that is, that they would " 'inflame the emotions of the jury, motivating them to use the information . . . to . . . punish one side because of the jurors' emotional reaction.' " (*Powell*, *supra*, 6 Cal.5th at pp. 162–163.) By contrast, the evidence had only limited probative value considering that White's counsel acknowledged at the motion hearing that there was no evidence warranting a self-defense instruction.

White maintains that extremist labels were relevant because they explained why he attended the protest dressed in protective gear and armed with bear spray. But using inflammatory labels was not necessary to establish this aspect of White's defense. And in any event, White ultimately established this defense at trial by testifying — despite the trial court's in limine ruling — that (1) he traveled to the protest because he "found out there were going to be Nazis" there, and (2) by describing members of the

36

adverse group as wearing attire and having tattoos associated with violent extremist groups he had previously encountered. White's counsel reinforced these points in closing argument. Therefore, even if the trial court erred under section 352, the error was harmless and did not render White's trial "fundamentally unfair." (*Hin*, *supra*, 17 Cal.5th at p. 482.)

## D. The Trial Court Acted Within Its Discretion in Finding Detective Clark Qualified to Testify as an Expert

White contends the trial court erred by designating Detective Clark an expert on Antifa because she "was unqualified to testify as an expert" and "the prosecution could have called its other expert, . . . who had prior experience with Antifa." We conclude the trial court acted within its discretion in determining Detective Clark was qualified to testify as an expert.

### 1. Background

At the request of codefendant Lightfoot, the trial court held an evidentiary hearing under Evidence Code section 402 "to determine the reliability and admissibility of Detective Clark's opinions on Antifa."

Detective Clark was hired by the San Diego Police Department in 2016, worked patrol for three years, transitioned to investigations for another three years, and was promoted to detective in 2022. She was assigned to investigate this case two days after the Pacific Beach incident. At that time, she "knew almost next to nothing" about Antifa — "as much as your average person watching the news would know."

Detective Clark investigated this case for about two years, devoting about 3,500 hours to it. She took numerous law enforcement training courses regarding terrorism, violent extremism, radicalization through social media,

and Antifa. She read two entire books, portions of other books, "at least over a hundred" articles, and "hundreds of thousands of pages of social media conversations" regarding "the signs, the symbols, the colors, the history, [and] the ideology" of Antifa. She also attended Antifa protests in San Diego in an undercover capacity and interviewed about six Antifa members. Detective Clark spent "a very large chunk" of the 3,500 hours on this case watching videos of the Pacific Beach incident as well as videos from "dozens" of other Antifa protests.

Detective Clark acknowledged she had not previously "given any presentations," "produced any writings," "qualified as an expert," or "handled any other case" focusing on Antifa. She also acknowledged that, although she was generally familiar that Antifa was hostile toward certain other groups like the Proud Boys, she "didn't focus [her] attentions" on those groups or what they do to "provoke" Antifa into attacking them.

After Detective Clark testified, both White's and Lightfoot's attorneys moved to preclude her from testifying as an expert on Antifa. Lightfoot's counsel argued Detective Clark was not qualified. White's counsel argued that "she doesn't know anything about [Antifa's] opponents" and that the People had a more qualified expert (Peter Simpson, the chief district attorney investigator in Portland, Oregon). The prosecutor defended Detective Clark's qualifications, proposed that the defense present their own experts regarding Antifa's opponents, and clarified that Simpson would "generally educate the jury as to the structure and how Antifa works" and Detective Clark would "apply[] those policies to the actual facts of the case."

The trial court found that Detective Clark was qualified to testify as an expert on Antifa. Citing her investigative experience and undercover work, the court concluded that Detective Clark had "data that's beyond a jury's

38

common experience" because she "extensively understood how Antifa's formed, what their goals were, understood the definitions . . . and the signs and symbols that they often use, [and] how they conduct their work on social media."

## 2. Relevant Legal Principles

" ' "A person is qualified to testify as an expert if he [or she] has special knowledge, skill, experience, training, or education sufficient to qualify him [or her] as an expert on the subject to which his [or her] testimony relates." (Evid. Code, § 720, subd. (a).) An expert witness's testimony in the form of an opinion is limited to a subject "that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ." (Evid. Code, § 801, subd. (a).)' [Citation.] The witness's qualifications may be established by his or her own testimony. (Evid. Code, § 720, subd. (b).)" (*People v. Fuiava* (2012) 53 Cal.4th 622, 672.) " 'When a preliminary showing is made that the proposed witness has sufficient knowledge to qualify as an expert under the Evidence Code, questions about the depth or scope of his or her knowledge or experience go to the weight, not the admissibility, of the witness's testimony.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 327–328.)

"A trial court's determination to admit expert evidence will not be disturbed on appeal absent a showing that the court abused its discretion in a manner that resulted in a miscarriage of justice." (*People v. Robinson* (2005) 37 Cal.4th 592, 630.) "Error regarding a witness's qualifications as an expert will be found only if the evidence shows that the witness ' " 'clearly lacks qualification as an expert.' " ' " (*People v. Farnam* (2002) 28 Cal.4th 107, 162, italics omitted (*Farnam*).)

39

### 3. Analysis

Detective Clark's qualifications were not so " ' " 'clearly lack[ing]' " ' " (*Farnam*, *supra*, 28 Cal.4th at p. 162) as to establish that the trial court abused its discretion in finding her qualified to testify as an expert on Antifa. Although when first assigned the case she had only as much knowledge about Antifa as a layperson might get from watching the news, Detective Clark's "own testimony" (Evid. Code, § 720, subd. (b)) showed that she acquired "special knowledge" (*id*., subd. (a)) by spending literally thousands of hours attending training courses; reading books, articles, and social media pages; watching videos of the charged offenses and of dozens of other Antifa protests; and conducting undercover operations and interviewing Antifa members in San Diego. As the trial court observed, this was sufficient to establish Detective Clark's qualifications as an expert on Antifa "beyond a jury's common experience."

White argues Detective Clark was not qualified because she had never served as an expert on Antifa before and only began studying Antifa after being assigned to this case. Yet White cites no legal authority directly supporting the proposition that either of these circumstances is necessarily disqualifying. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 408 ["To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error."].) Instead, he relies generally on cases in which courts exercised their discretion under the particular facts before them to

find a witness either qualified or unqualified to testify as an expert.[20] Comparisons to other cases involving discretionary decisions are of little value because "there are cases in which an order either way will be sustained on the ground that no abuse of discretion appears."  (*Ross v. Ross* (1941) 48 Cal.App.2d 72, 76; see *People v. Woods* (1993) 12 Cal.App.4th 1139, 1153 ["Part of the reason [cases involving discretionary decisions based on different facts are of little precedential value] lies in the concept of discretion. Quite similar facts might result in one trier of fact granting relief and another denying it, yet each ruling might be upheld."]; cf. *People v. Mendoza* (2011) 52 Cal.4th 1056, 1075 ["Because each case necessarily depends on its own facts, . . . the attempt to contrast [one] case with others falls short."].)

---

[20]    See, e.g., *Farnam*, *supra*, 28 Cal.4th at page 162 (finding a witness qualified as an expert on the "sequence of events" where he had 10 years of experience as a criminalist, held relevant undergraduate and master's degrees, "had worked for three different law enforcement crime laboratories" and "examined evidence in 250 to 300 homicide cases and had worked on over 300 sexual assault cases," and "presented a number of technical papers to his peers"); *People v. Brown* (2001) 96 Cal.App.4th Supp. 1, 36–37 (finding a witness qualified as an expert on "battered woman syndrome" where she "was a licensed marriage and family counselor who had dealt exclusively with domestic violence for the last 13 years, actively participated in four domestic violence organizations, and had previous direct contact with over 2,600 victims of domestic violence"); *People v. King* (1968) 266 Cal.App.2d 437, 446, 453, 457 (finding a witness unqualified to testify as a "voiceprint" expert despite holding a master's degree in electrical engineering and physics from Columbia university and working 39 years in a leading research lab; as the witness acknowledged, "his [voiceprint] technique [was] not generally recognized by the scientific disciplines in . . . related fields"); *People v. Chakos* (2007) 158 Cal.App.4th 357, 368–369 (finding a witness unqualified to testify about marijuana possession where he was no "more familiar than the average layperson . . . with the patterns of lawful possession for medicinal use that would allow him to differentiate them from unlawful possession for sale" [italics omitted]).

Accordingly, we conclude the trial court acted within its discretion in allowing Detective Clark to testify as an expert on Antifa.

## E. The Trial Court Did Not Err by Denying White's Motion for Mistrial and Dismissal Based on Alleged Discovery and *Brady* Disclosure Violations

White contends the trial court erred by denying his motion for a mistrial and dismissal based on statutory discovery and *Brady* disclosure violations arising from the prosecution's delayed production of video and photo evidence. We disagree.

### 1. Background

White filed a pretrial discovery motion under section 1054.1 seeking all videos of the Pacific Beach incident, including any taken by undercover law enforcement officers or informants. The court granted the request and the People produced more than 100 photos and videos of the protest.

Before the prosecution rested its case in chief, White's counsel informed the court that the prosecution had not produced all videos made by undercover officers. The attorney explained that he noticed in another person's video that Detective Burris appeared to be filming near Incident 5 (the assault on Ryan), yet the prosecution produced no corresponding video. The prosecutor responded that the People had "fully complied" with their discovery obligations and that Detective Burris reported that he had taken no video. But when White's counsel showed the court and the prosecutor the video, the prosecutor acknowledged it might show Detective Burris filming near Incident 5. The prosecutor contacted Detective Burris over the lunch break and the detective confirmed he had, in fact, filmed portions of the protest. The prosecutor obtained the videos and produced them to the

defense.  The prosecutor characterized the videos as "a lot of filming of the crowd" that did "not capture Incident 5."

About one week later, White moved for a mistrial and dismissal with prejudice based on the delayed production of Detective Burris's videos and about 90 additional photos.  White's counsel argued the video was material because it supported the defense position that during Incident 5 White was not pointing at the victim, but rather, was pointing to a different commotion down the nearby alley.  The attorney acknowledged, however, that the video did not capture the alley, Incident 5, or any alleged victim acting as an initial aggressor that would justify the use of self-defense.  He maintained, however, that the video and photos could have been used to impeach prosecution witnesses.

The trial court denied White's motion.  The court found the belated discovery materials were irrelevant because they did not support White's self-defense theory and had "no probative value" under an Evidence Code section 352 analysis because the evidence "doesn't go to a specific defense." The trial court declined to sanction the prosecutors or hold them in contempt. Indeed, White's counsel acknowledged "the prosecution team g[ave] him this stuff as soon as they had it, and they'[d] always been . . . up front with [him]."

### 2.  Relevant Legal Principles

"The People have a constitutional and a statutory duty to disclose information to the defense." (*People v. Bowles* (2011) 198 Cal.App.4th 318, 325.)  "Under *Brady, supra,* 373 U.S. 83 and its progeny, the prosecution has a constitutional duty to disclose to the defense material exculpatory evidence, including potential impeaching evidence.  The duty extends to evidence known to others acting on the prosecution's behalf, including the

43

police." (*People v. Superior Court* (*Johnson*) (2015) 61 Cal.4th 696, 709 (*Johnson*).) "For *Brady* purposes, evidence is material if it is reasonably probable its disclosure would alter the outcome of trial." (*Id.*, at pp. 709–710.)

" 'There are three components of a true *Brady* violation:  [(1)] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [(2)] that evidence must have been suppressed by the State, either willfully or inadvertently; and [(3)] prejudice must have ensued.' " (*Johnson, supra*, 61 Cal.4th at p. 710.)  On appeal, the appellant bears the burden of showing a *Brady* violation. (*Strickler v. Greene* (1999) 527 U.S. 263, 281–282.)  " 'We independently review the question whether a *Brady* violation has occurred, but give great weight to any trial court findings of fact that are supported by substantial evidence.' " (*People v. Masters* (2016) 62 Cal.4th 1019, 1067.)

"Section 1054.1 (the reciprocal-discovery statute) 'independently requires the prosecution to disclose to the defense . . . certain categories of evidence "in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . . to be in the possession of the investigating agencies." ' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 279–280 (*Verdugo*).) " 'Absent good cause, such evidence must be disclosed at least 30 days before trial, or immediately if discovered or obtained within 30 days of trial.' " (*Id.* at p. 280; see § 1054.7.)

Trial courts have broad discretion in determining whether a party has violated the discovery statutes and whether to impose sanctions for any such violation. (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 466 (*Mora and Rangel*).)  "Upon a showing that a party has not complied with [its statutory discovery obligations] . . . , a court may make any order necessary to enforce

44

[those] provisions . . . , including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order." (§ 1054.5, subd. (b); see *Verdugo, supra,* 50 Cal.4th at p. 280.) The court may also "advise the jury of any failure or refusal to disclose and of any untimely disclosure." (§ 1054.5, subd. (b); see *Verdugo,* at p. 280.) "The court may prohibit the testimony of a witness . . . only if all other sanctions have been exhausted." (§ 1054.5, subd. (c); see *People v. Barnett* (1998) 17 Cal.4th 1044, 1131 (*Barnett*) ["the normal remedy for noncompliance with a discovery order is not suppression of evidence, but a continuance"].) The court may dismiss a charge as a discovery sanction only when there has been a *Brady* violation. (See § 1054.5, subd. (c) ["The court shall not dismiss a charge [as a discovery sanction] unless required to do so by the Constitution of the United States."]; *People v. Gutierrez* (2013) 214 Cal.App.4th 343, 352 (*Gutierrez*) ["Section 1054.5, subdivision (c) preserves judicial power to dismiss charges for a *Brady* violation."]; *People v. Ashraf* (2007) 151 Cal.App.4th 1205, 1212 (*Ashraf*) ["If there was no *Brady* violation, then there was no conceivable basis for concluding the federal Constitution required dismissal."].)

Statutory discovery violations are "subject to the harmless-error standard set forth in [*Watson, supra,* 46 Cal.2d 818]." (*Verdugo, supra,* 50 Cal.4th at p. 280.) Therefore, "[t]o prevail on a claim alleging a violation of discovery statutes, an appellant must show there is a reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different." (*Mora and Rangel, supra,* 5 Cal.5th at p. 467.) " 'It is defendant's burden to show that the failure to timely comply with any discovery order is prejudicial, and that a continuance would

45

not have cured the harm.' " (*People v. Thompson* (2016) 1 Cal.5th 1043, 1103 (*Thompson*).) A court's proper exercise of discretion under the discovery statutes "does not violate a criminal defendant's confrontation or due process rights." (*Id.* at p. 1105.)

### 3. Analysis

We conclude the trial court properly denied White's motion for mistrial and dismissal based on the prosecution's belated production of discovery materials.

White has not met his burden to establish a *Brady* violation because he has not shown that the materials were "suppressed" — they were merely belatedly produced. (See *Mora and Rangel, supra,* 5 Cal.5th at p. 467 ["No *Brady* errors occurred here. Evidence actually presented at trial is not considered suppressed for *Brady* purposes, even if that evidence had not been previously disclosed during discovery."]; *Verdugo, supra,* 50 Cal.4th at p. 281 [same].) White acknowledges this deficiency but argues there nonetheless was a *Brady* violation because *Brady* cautioned against " 'contrived' " convictions based on " 'deliberate deception of court and jury by the presentation of testimony known to be perjured.' " (*Brady, supra,* 373 U.S. at p. 86.) He maintains this occurred here because he "was deceived by *inaccurate* information by a testifying detective." (Italics added.) White fails, however, to identify specifically which testimony was "inaccurate" or to explain why and to whom it was " 'known to be perjured.' "[21] (*Brady,* at p.

---

[21] For example, if White is referring to Detective Burris, this detective did not testify at trial. If White is referring to Detective Clark or Detective Wagner, White does not explain how they knowingly testified falsely.

86.)  Moreover, White's trial counsel acknowledged the prosecutors had "always been . . . up front with [him]."

White also fails to persuade us that the belatedly produced video was "material exculpatory evidence."  (*Johnson, supra*, 61 Cal.4th at p. 709.)  To the contrary, White's trial counsel acknowledged the video neither supported his self-defense theory nor showed what was happening in the alley near Incident 5.  Considering these concessions and the trial court's findings that the video was irrelevant and likely inadmissible under Evidence Code section 352, we fail to see how the video was material to White's defense.

We therefore conclude White has not met his burden to establish a *Brady* violation.

Nor has White persuaded us that the trial court abused its discretion by not dismissing the charges as a remedy for a statutory discovery violation.  To begin, because White has not established a *Brady* violation, the trial court was statutorily prohibited from dismissing the charges as a discovery remedy.  (See § 1054.5, subd. (c); *Gutierrez, supra*, 214 Cal.App.4th at p. 352; *Ashraf, supra*, 151 Cal.App.4th at p. 1212.)

Second, despite acknowledging in his appellate briefing that he "must demonstrate a continuance would not cure the harm" caused by delayed disclosure, White never requested a continuance from the trial court.  (See *Thompson, supra*, 1 Cal.5th at p. 1103 [finding that the defendant's failure to request a continuance "when allegedly first confronted with [a witness's] testimony at trial with no previous pretrial discovery" was "fatal to her contention on appeal"].)  Nor has White attempted to show on appeal that a continuance would have been ineffective.

Finally, and in any event, White has not shown that he suffered any prejudice from the People's untimely discovery production.  He claims that

47

because his trial "counsel was unaware any discovery was missing until the prosecution had *nearly* rested," (italics added) he was "unable to effectively cross-examine the detectives and others." But all of the testifying detectives and key prosecution witnesses were subject to recall and could have been called during White's case, which had not yet begun.[22] If White needed more time to effectively question these witnesses, he could have asked for it. The fact he did not is "fatal" to his challenge. (*Thompson*, *supra*, 1 Cal.5th at p. 1103.)

White also argues the belated production "denied [him] the opportunity to try to negotiate a favorable plea deal to avoid jail time like many codefendants did based on th[e] weakness in the case" revealed by the video. He does not explain, however, whether he engaged the prosecution in settlement talks after the new evidence was disclosed. Moreover, as White's trial counsel acknowledged, the video did not show Incident 5 or the nearby alley. It therefore did little to show weakness in the prosecution case.

Finally, even if the video were exculpatory, it was unlikely to have any impact on White's conspiracy conviction because there were numerous other overt acts unrelated to Incident 5 that supported his conviction. Indeed, the jury found codefendant Lightfoot guilty on charges relating to five of those overt acts.

---

[22] Early in the trial, the court and counsel discussed the potential need to recall prosecution witnesses after defense witnesses laid a foundation for the admission of certain evidence. The court said, "There's no problem doing that."

## F. The Trial Court Did Not Err by Denying White's Motion to Dismiss Under Section 1118.1 Because Substantial Evidence Supports White's Conviction

White contends the trial court erred by denying his motion to dismiss under section 1118.1 because his "conspiracy conviction is not supported by substantial evidence" inasmuch as he "intended [only] to lawfully protest." We disagree.

### 1. Background

After the prosecution rested, White moved to dismiss his charges under section 1118.1 for lack of sufficient evidence. He argued that while a fraction of the Antifa crowd may have engaged in conduct "that's just point-blank wrong and criminal," "the overwhelming majority of evidence" showed that White was there only to render medical treatment to people exercising their First Amendment rights. He emphasized there was no evidence of "advanced discussions" involving White or "any other person planning violence." White maintained the evidence showed that he tried to deescalate Incident 3 involving John and he disputed that the evidence showed he pointed at Ryan during Incident 5.

The prosecutor argued the existence of a conspiracy was supported by the evidence showing the Antifa crowd "dressed in matching outfits," "brought weapons," and "all acted together throughout the entire day committing violent assaults across every person they came across," as shown in "video after video of them acting together."

The trial court denied the motion. The court observed that White and Lightfoot traveled together to San Diego, wore similar attire, and had walkie-talkies for communication. The court also noted that "throughout the videos,"

49

White was "always in front and always leading." It appeared to the court that during Incident 3 with John, White appeared to "assert[] dominance with [his] stature, with the way he's dressed, and it seem[ed] like the other parties submitted to him." The court observed that the videos showed that wherever White went, violent actors followed. The court found that this showed "an orchestrated event with all of them going . . . from event to event where people were injured." The court also cited White's discharge of bear spray at a bicyclist during Incident 8, and Ryan's testimony that White bear sprayed him at the end of Incident 5.

## 2.  Relevant Legal Principles

" ' "The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction." ' " (*People v. Lamb* (2024) 16 Cal.5th 400, 442 (*Lamb*).) " ' " 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence — evidence that is reasonable, credible and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a

50

contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility.' " ' " (*People v. Oyler* (2025) 17 Cal.5th 756, 819–820.) In reviewing a ruling on a section 1118.1 motion, " '[t]he sufficiency of the evidence is tested at the point the motion is made. [Citations.] The question is one of law, subject to independent review.' " (*Lamb*, *supra*, 16 Cal.5th at p. 442.)

"Conspiracy ' "is an inchoate offense, the essence of which is an agreement to commit an unlawful act." ' [Citation.] This crime has four elements: (1) the existence of an agreement between at least two persons; (2) the specific intent to agree to commit an offense; (3) the specific intent to commit the offense that is the object of the agreement; and (4) an overt act in furtherance of the conspiracy, which may be committed by any conspirator." (*People v. Ware* (2022) 14 Cal.5th 151, 163 (*Ware*).)

" ' " 'Evidence is sufficient to prove a conspiracy to commit a crime "if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime." ' " [Citation.] "Evidence of an agreement does not require proof that the parties met and expressly agreed; a criminal conspiracy can be shown through circumstantial evidence." ' ' " ' "The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." ' " ' " (*Lamb*, *supra*, 16 Cal.5th at p. 442.) "Although two people committing a crime together does not alone prove a conspiracy, it is probative of a conspiracy when there is indicia of organization and forethought." (*Id.* at p. 443.)

"Participation in a riot is a criminal offense. (§ 405.) 'Any use of force or violence, disturbing the public peace, or any threat to use force or violence, if accompanied by immediate power of execution, by two or more persons

51

acting together, and without authority of law, is a riot.' (§ 404, subd. (a).)" (*People v. Abelino* (2021) 62 Cal.App.5th 563, 578.)  " '[I]t is the concurrence of unlawful action by individuals in the use, or threat to unlawfully use force or violence that constitutes the offense of riot.' " (*Ibid*.)  "All persons who encourage, incite, promote, give support to or countenance a riot are principals in a riot." (*Ibid*.)

### 3. Analysis

We conclude from our independent review of the record that substantial evidence supports White's conviction for conspiracy to riot.

First, there was substantial evidence of an agreement between White and his coconspirators to riot.  (See *Ware, supra*, 14 Cal.5th at p. 163 ["The first element, concerning the existence of an agreement, 'is the crux of criminal conspiracy.' "].)  White and several coconspirators were members of an encrypted messaging thread titled "SD Fash Bash."  The word "[b]ash" in this title carries a violent connotation.  Members of the chat talked about taking "action" and made plans to "squad up."  White's Instagram handle — "@theantifa*soldier*" rather than, for example, "@theantifa*medic*" — also suggests he intended to engage in violence rather than render medical aid.  Additionally, in a different message thread, White wrote that he was "trying to get there super early to hold space *and not let them gather early*."  The group also chatted about using black bloc, which consists of both anonymizing attire and disruptive and aggressive tactics that include "violent confrontation to get [adversaries] to leave."

White's and others' appearances upon their arrival in Pacific Beach further support a finding they intended to riot.  Six-foot-three-inch White appeared in head-to-toe tactical armor and was armed with bear spray, a

52

knife, scissors, and a taser.  Lightfoot and others were also armed.  White and Lightfoot also had walkie-talkies.

The swiftness with which violence ensued after White's arrival further supports a finding his group intended to riot.  Within minutes of arriving, White stood feet behind Lightfoot during Incident 1 as Lightfoot bear sprayed juveniles who posed no threat.  White then treated Lightfoot's eyes for bear spray "blowback," but there is no evidence that White treated anyone else that day.  Ryan also testified that White — who "was one of the main instigators" — directed the Antifa crowd to attack Ryan during Incident 5 and that White himself pepper sprayed Ryan at the end of this attack.  White's involvement in Incident 5 along with other Antifa members supports the existence of a conspiracy to riot.  (See *Lamb*, *supra*, 16 Cal.5th at p. 443 ["two people committing a crime together . . . is probative of a conspiracy when there is indicia of organization and forethought"].)

There was also abundant evidence that White or another coconspirator took an overt act to accomplish the goal of the conspiracy.  White and others traveled to San Diego with tactical attire and weapons; White bear sprayed a man and his dog during Incident 2; White threatened to cover a photographer in bear spray during Incident 3; White directed the Antifa crowd to Ryan and then chased and bear sprayed Ryan during Incident 5; and White bear sprayed an unarmed bicyclist during Incident 8.  Although White's actions alone satisfy the overt act element, any of his coconspirators' many overt acts would also satisfy this requirement.  (See *Ware*, *supra*, 14 Cal.5th at p. 164 ["a jury need only find that *any* member of the conspiracy committed a single overt act, *whether criminal or not*" (italics added)].)

Finally, White's and his coconspirators' subsequent celebrations of their violence suggest that they intended to engage in that conduct all along.  (See

53

*People v. Starski* (2017) 7 Cal.App.5th 215, 224 ["The trier of fact 'may consider the events that occurred "at or before" or "subsequent" to the formation of the agreement.'".) For example, White wrote of the attack on Ryan, "Yeah we f[***]ed his s[***] up." White also wrote of perceived white supremacists, "We've been handing them their own a[**]es for months. They're starting to not come out as much anymore." The jury could infer from these messages that White fulfilled his intent to work with others to use violence or threats of violence to disturb the public peace.

On this record, there was sufficient evidence to support White's conviction for conspiracy to riot. The trial court therefore properly denied White's motion to dismiss under section 1118.1.

## G. The Trial Court Did Not Misinstruct the Jury Regarding the Elements of a Conspiracy

White contends the trial court misinstructed the jury regarding the elements of a conspiracy in two ways: (1) by failing to specify the names or descriptions of unidentified coconspirators, and (2) by referring to coparticipants as "coconspirators," which "improperly presumed the existence of a conspiracy." Neither claim persuades us. The court's instruction adequately described unidentified coconspirators either by their names or their specific conduct. And although the instruction used the term "coconspirator" on occasion, the instruction as a whole made clear that the existence of a conspiracy was a question for the jury to decide.

### 1. Background

At the jury instruction conference, the court advised that it would instruct the jury regarding the elements of a conspiracy using CALCRIM No. 415. The court explained that the instruction would include the overt

54

acts described in the Fourth Indictment, a copy of which the court would also provide to the jury "so they have something to match up with."

As given, CACLRIM No. 415 stated the following requirements for finding White guilty of conspiracy:

> To prove that a defendant is guilty of this crime, the People must prove that:
>
> > 1.  The defendant intended to agree and did agree with one or more of the other defendants, coconspirators, or unidentified coconspirators to commit Riot;
> >
> > 2.  At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit Riot;
> >
> > 3.  One of the defendants, or coconspirators, or unidentified coconspirators, or all of them committed at least one of the following overt acts to accomplish Riot:
> >
> > [Overt Act Nos. 1 through 105 listed]
> >
> > AND
> >
> > 4. At least one of these overt acts was committed in California.
>
> To decide whether a defendant and one or more of the other alleged members of the conspiracy intended to commit Riot, please refer to the separate instructions that I will give you on that crime.
>
> The People must prove that the members of the alleged conspiracy had an agreement and intent to commit Riot. The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit that crime.

55

An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime.

[¶] . . . [¶]

You must all agree that at least one overt act was committed in California by at least one alleged member of the conspiracy, but you do not have [*sic*] agree on which specific overt act or acts were committed or who committed the overt act or acts.

You must make a separate decision as to whether each defendant was a member of the alleged conspiracy.

A member of a conspiracy does not have to personally know the identity or roles of all the other members.

Someone who merely accompanies or associates with members of a conspiracy but who does not intend to commit the crime is not a member of the conspiracy.

Evidence that a person did an act or made a statement that helped accomplish the goal of the conspiracy is not enough, by itself, to prove that the person was a member of the conspiracy.

## 2. Relevant Legal Principles

" 'A claim of instructional error is reviewed de novo.  [Citation.]  An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law.  [Citation.]  In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution.  [Citations.]  The challenged instruction is viewed "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." ' " (*People v. Lewis*

56

(2023) 14 Cal.5th 876, 900 (*Lewis*).) " 'Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions.' " (*People v. Thomas* (2023) 14 Cal.5th 327, 382.)

CALCRIM No. 415 formulates the four elements of the crime of conspiracy as follows:

> To prove that (the/a) defendant is guilty of this crime, the People must prove that:
>
> 1. The defendant intended to agree and did agree with [one or more of] (the other defendant[s]/ [or] <*insert name*[s] *or description*[s] *of coparticipant*[s]>) to commit <insert alleged crime[s]>;
>
> 2. At the time of the agreement, the defendant and [one or more of] the other alleged member[s] of the conspiracy intended that one or more of them would commit <insert alleged crime[s]>;
>
> 3. (The/One of the) defendant[s][,] [or < *insert name*[s] *or description*[s] *of coparticipant*[s]>][,] [or (both/all) of them] committed [at least one of] the following alleged overt act[s] to accomplish <insert alleged crime[s]>: <insert the alleged overt acts>;
>
> AND
>
> 4. [At least one of these/This] overt act[s] was committed in California. (Italics added.)

The corresponding Bench Note to this instruction states: "In elements 1 and 3, insert the names or descriptions of alleged coconspirators if they are not defendants in the trial." (CALCRIM No. 415.)

### 3. Analysis

#### a. Description of Unidentified Coconspirators

White contends CALCRIM No. 415, as given, inadequately described the alleged coconspirators because it did not satisfy the admonition in the pattern instruction and accompanying Bench Note to "insert the names or descriptions of alleged coconspirators." He acknowledges that many of the overt acts listed in the instruction identify alleged coconspirators by name, but he argues that the remainder are deficient because "31 of the 105 overt acts alleged participation by 'unidentified coconspirators' *without names or descriptors*."[23] (Italics added.) We are not persuaded.

Although 30 of the cited overt acts do not identify alleged coconspirators *by name*, each overt act identifies the alleged coconspirator *by specific conduct*. For example, Overt Act No. 22 states: "On or about January 9, 2021, [certain named coconspirators] and other unidentified coconspirators chased and surrounded victim S.G." Similarly, Overt Act No. 23 states: "On or about January 9, 2021, [certain named coconspirators] and other unidentified coconspirators participated in a group attack on victim S.G." As yet another example, Overt Act No. 24 states: "On or about January 9, 2021, [certain named coconspirators] and other unidentified coconspirators participated in a group attack on S.M. (previously unidentified victim two)." Every other challenged overt act includes a similar description of the alleged

23    White identifies the following 31 Overt Act Nos.:  22, 23, 24, 25, 31, 38, 39, 41, 48, 54, 56, 57, 63, 69, 70, 73, 77, 80, 81, 82, 84, 86, 87, 88, 89, 90, 91, 93, 94, 97, and 98.  However, one of the cited overt acts — Overt Act No. 86 — *does* identify the alleged coconspirator by name:  "On or about January 9, 2021, *coconspirator Samuel Howard Ogden* physically confronted a police officer who was attempting to make an arrest of an unidentified female coconspirator." (Italics added.) This leaves 30 challenged overt acts.

unidentified coconspirator's specific conduct. White cites no authority holding that such descriptions are inadequate.

The only potentially relevant case law White cites is *People v. Smothers* (2021) 66 Cal.App.5th 829, which discussed a related pattern jury instruction and corresponding Bench Note. (*Id*. at pp. 870–872; see CALCRIM No. 416 ["Evidence of Uncharged Conspiracy"].) *Smothers* is inapt. First, the cited discussion is merely dicta because the court reversed on other grounds. (*Smothers,* at p. 869 ["Although we need not reach the issue of whether the court erred in its uncharged conspiracy instruction, in light of our reversal, we will do so here to provide guidance to the trial court if a retrial of this matter is conducted."].) Second, the failure to identify alleged coconspirators in *Smothers* — a 25-year-old cold case murder (*id*. at p. 836) — "could have readily led to . . . confusion" (*id*. at p. 872) because the jury instruction did not meaningfully identify the alleged coconspirators in any way; it merely required the jury to find that "[t]he defendant intended to agree and did agree with one or more other persons to commit murder" (*id*. at p. 872) and that "[t]he defendant, or a co-conspirator . . . committed at least one" overt act that consisted of the vague steps of traveling to the victim's house and murdering her (*id*. at p. 871).

Here, by contrast, the jury instruction included about 11 pages of detailed overt acts that identified many alleged coconspirators by name and described others by their specific conduct. Moreover, the jury saw extensive video and photographic evidence of many of the overt acts. Under the circumstances, the instruction adequately described the alleged coconspirators.

### b. Use of the Word "Coconspirators"

We are similarly unpersuaded by White's contention that the instruction's use of "the term coconspirator improperly presumed the existence of a conspiracy." Although it would have been preferable for the court to have used the model instruction's less definitive term "coparticipant" (CALCRIM No. 415) rather than "coconspirator," our review of the instruction as a whole makes clear that the jury understood it was required to determine the existence of a conspiracy among coconspirators. For example, the instruction refers to "*alleged* members of the conspiracy," or similar variations, at least six times. (Italics added.) And most of the references to specific named "coconspirators" appear in the instruction's recitation of overt acts, which were taken nearly verbatim from the operative indictment, which the trial court provided to the jury "so they have something to match up with." "We presume that jurors follow the instructions provided by the court in the absence of a showing to the contrary." (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 821.) Therefore, the jury understood that references to coconspirators in CALCRIM No. 415 were to the allegations in the indictment rather than to conclusive findings that removed the question from their consideration.[24]

---

[24] In fact, the version of CALCRIM No. 415 used by the trial court specifically reminded jurors that "[t]he People must prove that the members of the alleged conspiracy had an agreement and intent to commit Riot."

### H. Assuming Without Deciding that the Trial Court Erred by Failing to Instruct the Jury Sua Sponte That Self-defense is a Defense to Conspiracy, the Error was Harmless

The trial court instructed the jury that self-defense is a defense to all charges *except* conspiracy to riot. White contends "the trial court erred by failing to instruct jurors sua sponte . . . that self-defense . . . was *also* a defense to conspiracy to riot . . . and the overt act assaults." (Italics added.)

The People maintain the trial court did not err because self-defense is not a defense to conspiracy to riot in that self-defense does not apply to conspiracy charges (i.e., as a matter of logic, "one cannot agree with others to commit a future crime in self-defense") and self-defense does not apply to overt acts because overt acts need not be criminal acts. Alternatively, the People argue that even if the trial court erred, the error was harmless because White's jury also found Lightfoot guilty of five counts of using tear gas *not in self-defense*, and those counts also constituted overt acts in furtherance of the conspiracy.

Assuming without deciding that the trial court had a sua sponte duty to instruct the jury regarding self-defense as a defense to conspiracy, we agree with the People that any error was harmless.

#### 1. Background

Over the prosecution's objection, the trial court instructed the jury regarding self-defense as a defense to the aggravated assault charges against White and Lightfoot.[25] (See CALCRIM No. 875 ["To prove that a defendant

---

[25] The prosecution objected that there was no evidence of imminent danger to White or others. The trial court essentially agreed but gave the instruction out of an abundance of caution.

is guilty of this crime, the People must prove" that "the defendant did not act in self-defense or in defense of someone else."].)  The court also instructed on self-defense as a defense to the lesser included offense of simple assault.

Additionally, the court instructed the jury regarding self-defense as it relates to several other issues.  First, the court instructed jurors that they could consider evidence of uncharged acts for a variety of purposes, including self-defense.  Specifically, the court gave CALCRIM No. 375, which states in part:  "The People presented evidence of other behavior by the defendants that was not charged in this case.  [¶] . . . [¶]  If you decide that the defendant committed the uncharged acts, you may, but are not required to, consider that evidence for the limited purpose of deciding whether: [¶] . . . [¶] The defendants did or [*sic*] not  act in self-defense in this case."

Second, the court instructed the jury on self-defense as a defense to Lightfoot's charges of using tear gas not in self-defense and assault with a deadly weapon (and the lesser included offense of simple assault).

Finally, the court instructed the jury on self-defense as a defense to one coconspirator's overt act of assault with a stun gun.

Regarding self-defense principles, the court gave CALCRIM No. 3470, which stated, among other things, that the defendant must have "reasonably believed that he or someone else was in imminent danger" and that a "[b]elief in future harm is not sufficient, no matter how great or how likely the harm is believed to be."  The court also instructed that the right to self-defense may not be contrived (CALCRIM No. 3472) and that "the right to use force ends" "[w]hen the attacker withdraws or no longer appears capable of inflicting any injury" (CALCRIM No. 3474).

The trial court did not instruct the jury that self-defense is a defense to conspiracy to riot.

## 2. Relevant Legal Principles

"The trial court must instruct sua sponte as to defenses ' " 'that the defendant is relying on . . . , or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " ' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1224; see *People v. Brooks* (2017) 3 Cal.5th 1, 73.) "Substantial evidence supporting sua sponte instruction on a particular defense is evidence that is 'sufficient to "deserve consideration by the jury, i.e., 'evidence from which a jury composed of reasonable [persons] could have concluded' " ' that the particular facts underlying the instruction did exist." (*Brooks*, at p. 75.) We review de novo whether such an instruction was warranted. (*People v. Simon* (2016) 1 Cal.5th 98, 133.)

If we find that instructional error occurred, we may not reverse the judgment unless the error was prejudicial. (See Cal. Const., art. VI, § 13; *People v. Hendrix* (2022) 13 Cal.5th 933, 941.) Our Supreme Court "ha[s] yet to determine whether a trial court's failure to instruct on a requested affirmative defense instruction supported by substantial evidence is federal constitutional error or state law error." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 199; but see *People v. Schuller* (2023) 15 Cal.5th 237, 260 ["emphasiz[ing]" that other than in cases involving "the 'unique' relationship between murder and voluntary manslaughter [citation], . . . the general rule [is] that the failure to instruct on other forms of *lesser included offenses* in noncapital cases is an error of state law" (italics added)].) We need not decide which standard applies here because we would find the error was harmless under either standard. (See, e.g., *Gonzalez*, at p. 199; *People v. Morales* (2021) 69 Cal.App.5th 978, 994 [finding the trial court's failure to instruct on self-defense "was harmless under either the federal or state standards"].)

### 3. Analysis

Assuming without deciding that the trial court erred by failing to instruct the jury that self-defense is a defense to conspiracy to riot, we conclude the error was harmless beyond a reasonable doubt.

As the People observe, Lightfoot's use of bear spray in counts 6, 7, 8, 9, and 15 also constituted overt acts in furtherance of the conspiracy. By finding Lightfoot guilty of using bear spray "not in self-defense," the jury necessarily rejected self-defense as a defense to these overt acts. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1086–1087 [finding the failure to instruct on unreasonable self-defense as a basis for reducing murder to manslaughter harmless because the jury's true finding on a robbery-murder special circumstance showed that the jury necessarily rejected the unreasonable self-defense theory]; *People v. Clark* (2011) 201 Cal.App.4th 235, 251 [finding the failure to instruct on self-defense as to one charge harmless under any standard where the jury rejected self-defense as a defense to a different charge based on the same conduct].) These overt acts are sufficient to support White's conspiracy conviction. (See *Ware, supra*, 14 Cal.5th at p. 164 ["a jury need only find that *any* member of the conspiracy committed *a single* overt act" (italics added)]; see *ibid.* ["Even if the prosecution had presented no evidence of any other overt act, the attempted murder conviction of an alleged coconspirator in furtherance of the conspiracy is sufficient to show the overt act element has been satisfied."].)

Notably, despite the People devoting a section of their respondent's brief to this harmlessness theory, White did not address it in his reply brief. White's failure to address the argument is tantamount to a recognition of the argument's merit. (See *People v. Lewis* (2025) 111 Cal.App.5th 1078, 1092 ["We treat defendant's failure to refute this conclusion as a concession of that

conclusion."]; *Ross v. Superior Court* (2022) 77 Cal.App.5th 667, 681 ["[petitioner] failed to respond in his reply brief, thereby 'implicitly conced[ing] . . . the [real party in interest]'s argument on this point' "].)

The failure to instruct on self-defense as to overt acts was also harmless because self-defense was inapplicable to some of those acts. For example, Overt Act Nos. 10 and 11 alleged that White "gathered black clothing, a gas mask, a tactical helmet, a tactical vest, gloves, and armed himself with a tear gas weapon" and "traveled to Pacific Beach." Because these overt acts are not criminal and occurred long before White could possibly have faced any imminent threat that would have justified his use of force to defend himself or others, these acts could not have formed the basis of a self-defense claim. (See CALCRIM No. 3470 [instructing that the defendant must have "reasonably believed that he or someone else was in imminent danger" and that a "[b]elief in future harm is not sufficient, no matter how great or how likely the harm is believed to be"].)

Similarly, Overt Act No. 85 (pertaining to Incident 8) alleged that White "sprayed [an] unidentified victim . . . with a tear gas weapon." White presented no evidence supporting self-defense in this incident — he testified he could not recall it — and video evidence shows he was in no danger, but rather, sprayed an unarmed bicyclist without provocation.

Finally, considering the instructions as a whole, we note the trial court instructed with CALCRIM No. 375 that the jury could consider evidence of uncharged acts in determining whether "[t]he defendants did or [*sic*] not act in self-defense in this case." The jury would reasonably have determined that this instruction pertained to the uncharged overt acts.

Apart from the overt act element of the conspiracy offense, any instructional error was also harmless as to the agreement element of the

offense. That is, assuming one can agree in advance to riot only in self-defense, there is no evidence in the record that these coconspirators ever made such an agreement. It is more likely, had the jury found that the coconspirators made such an agreement, jurors would not have found White guilty of conspiracy to riot. Indeed, the crux of White's defense was that he intended only to peacefully protest. By finding him guilty, the jury rejected this claim.

We therefore conclude that even assuming the trial court erred by failing to instruct the jury that self-defense is a defense to conspiracy to riot, the error was harmless beyond a reasonable doubt.

## I. The Trial Court Acted Within Its Discretion in Denying White's Request to Remove Jurors Who Reported Safety Concerns

White contends the trial court erred by failing to remove jurors who reported to the court their concerns about an unsettling encounter with White outside the courthouse. We see no error.

### 1. Background

Jurors ended deliberations a little early one Friday afternoon. As two jurors (Juror No. 7 and Juror No. 12) left the courthouse, they passed by White, his girlfriend, Lightfoot, and a fourth person (later identified as White's roommate from Los Angeles), who were standing on the stairs outside. Juror No. 7 believed the roommate may have photographed her. The two jurors returned to the courthouse to report what happened. As they were returning, they encountered a third juror (Juror No. 2) and told her what just happened.

66

The trial court reviewed courthouse surveillance footage and summarized it in a conference with counsel. The court observed the two jurors walk past White and his group, who were "unfortunately . . . in the worst possible place they could be when the jurors were leaving." Although the court found the footage "inconclusive" as to whether the jurors were photographed, the court could "see how they would think that they were being photographed." The court separately questioned each of the involved jurors.

Juror No. 7 stated that as she and Juror No. 12 were leaving the courthouse, Juror No. 12 said she was "too scared to go outside by herself" because she saw White and his group outside. Juror No. 7 offered to go with Juror No. 12. As these jurors exited the courthouse and went down the stairs, they passed near White's group. Juror No. 7 "made eye contact" with White and then put her head down. When they made eye contact, White's group gave Juror No. 7 a "smirk" that made her "uncomfortable." As the jurors walked past, Juror No. 7 was startled upon noticing that White's roommate appeared to be photographing her with his phone. He also "made a 'hmm' noise to . . . one of the defendants or the girlfriend." Juror No. 7 felt she needed to report the encounter to the court because she was concerned that by looking at White she violated the court's "strict orders not to speak or make contact" with the parties or counsel. When asked whether she could "still be fair and impartial to both sides" and "decide this case on the evidence and the law [as] instructed," Juror No. 7 responded, "absolutely." The court told the juror the mishap was the court's fault and that the court would "make some rules about how [jurors] leave the courthouse and where people are."

Juror No. 12 reported feeling "uneasy" upon seeing the group outside the courthouse because she "didn't know why they were [t]here." White was wearing a suit and Lightfoot was wearing a hoodie with the hood over his head. Juror No. 12 looked down to avoid making eye contact as she walked past the group. After they walked past, Juror No. 7 stated that her " 'Spidey senses' " were " 'tingling' " and asked whether the roommate looked like "one of the coconspirators from the videos." Juror No. 12 did not see because she was looking down. Juror No. 12 told the court that her "uneasiness" came from the fact that White's group "clearly saw" the jurors but did not "turn around or walk away." When the court asked Juror No. 12 if she could "still be fair and impartial to both sides," she answered, "Yeah, absolutely. [¶] . . . [¶] My only thing is, I just don't want to run into—" The court interjected that it was "going to fix that" to "make sure that doesn't happen again." The court added that it was the court's "fault, not any of the parties."

Juror No. 2 told the court that as she was leaving the courthouse, she saw that Juror No. 7 and Juror No. 12 "were visibly upset" and she "could just tell right away, something big kind of happened." Those jurors told Juror No. 2 that as they were leaving, they walked past White's group and "kind of had to go through them, like they were flanked on either side." One of the jurors said that the person on their left had a camera "pretty much pointing it towards them," which "was a bit concerning and frightening" "just because of what [they were] deliberating" in the case. Juror No. 2 agreed they should inform the court what happened. She assured the court she could "still be fair and impartial." The court told her the encounter was the court's fault and not the parties' fault, and that the court would "make some clear rules so everybody understands them, so that the jurors can leave." The court instructed Juror No. 2 that she could not consider the encounter when

68

deliberating, and that the court would probably remind all jurors "that what you see when court is not in session is not evidence."

Outside the jurors' presence, White's counsel explained that he had instructed White to be nearby in case the jury reached a verdict. White was not expecting to see jurors but they happened to leave early that day. After speaking with White, counsel was "completely assured that no one was intentionally filming anything."

The court advised counsel that it was "not going to do anything tonight" because "this just is all too squirrely." The court noted that White lacked "self-awareness" and that his group "did not move" when jurors approached. The court posited that it was "either . . . self-awareness, or it's intimidation." The court warned that if either defendant comes within 10 feet of any juror again, the court will put that defendant in custody.

White's counsel asked the court to remove "at least" Juror No. 7 from the jury because she "seemed particularly upset." The prosecutor responded that the juror "was very forthcoming" and "very quickly" confirmed she would remain impartial. The court denied the request, explaining that it did not "see any prejudice to the defense or the People" because all the jurors confirmed they could be fair and impartial. As to Juror No. 7's demeanor, the court reasoned she was likely "amped up" from being put on the witness stand late on a Friday afternoon and that "she calmed down after a while."

The jury resumed deliberating the following Monday morning. By the lunch break, the court had not followed up with the jury about the Friday afternoon incident. At 11:59 a.m., the jury submitted a written note with several questions, one of which related to the Friday incident: "From Friday incident [with] Jurors #7, #12 what was the outcome re: juror safety coming & going from courthouse? (Question from #7, #12)." After conferring with

69

counsel, the trial court told the jury orally, "You're to base your decision solely on the evidence you received during the trial and the law as I instructed.  Anything you saw or heard when the court was not in session is irrelevant and is to be disregarded.  The court has considered the issue of juror safety and has taken appropriate steps to ensure your safety.  Do not let this interfere with your deliberations."

## 2. Relevant Legal Principles

"The federal and state Constitutions guarantee a criminal defendant the right to a trial by an impartial and unbiased jury." (*Brooks*, *supra*, 3 Cal.5th at p. 98.)  "An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it." ' " (*In re Hamilton* (1999) 20 Cal.4th 273, 294 (*Hamilton*).)  "The loss of impartiality requires dismissal of the juror." (*Mora and Rangel*, *supra*, 5 Cal.5th at p. 483.)

"Juror misconduct, such as the receipt of information other than what is presented at trial, generally raises a rebuttable presumption of juror bias and that the defendant suffered prejudice." (*Brooks*, *supra*, 3 Cal.5th at p. 98.)  Inadvertent "[r]eceipt of extraneous information is not ' "misconduct" in the pejorative sense,' but it 'may require . . . examination for probable prejudice.' " (*Mora and Rangel*, *supra*, 5 Cal.5th at p. 484; see *Brooks*, at p. 98 ["even inadvertent exposure to out-of-court information may constitute misconduct giving rise to the presumption of prejudice"].)

"[W]hether an individual verdict must be overturned for jury misconduct or irregularity ' " 'is resolved by reference to the substantial likelihood test, an objective standard.' " ' " (*Hamilton*, *supra*, 20 Cal.4th at p. 296.)  Under this test, " 'the presumption of prejudice is rebutted, and the

70

verdict will not be disturbed, if a reviewing court concludes after considering the entire record, including the nature of the misconduct and its surrounding circumstances, that there is no substantial likelihood that the juror in question was actually biased against the defendant.' " (*Brooks*, *supra*, 3 Cal.5th at pp. 98–99.) Our Supreme Court has "emphasize[d] that before a unanimous verdict is set aside, the likelihood of bias . . . must be *substantial*. (*People v. Danks* (2004) 32 Cal.4th 269, 304.)

" 'Our inquiry in this regard is a "mixed question of law and fact" subject to independent appellate review. [Citation.] But " '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' " ' " (*Brooks*, *supra*, 3 Cal.5th at p. 99.)

### 3. Analysis

Based on our independent review of the record, we are satisfied that there is no substantial likelihood that Juror No. 7, Juror No. 12, or Juror No. 2 was biased against White.

The trial court promptly undertook a thorough inquiry. This included reviewing courthouse surveillance footage and separately examining each juror. The court noted that the jurors' accounts of the incident were consistent with the court's observations of the surveillance footage. The court also told the jurors that the court — and not any party or juror — was to blame for the mishap. Each juror unequivocally reaffirmed that she could be fair and impartial to all parties. The trial court expressly relied on these assurances in denying White's removal request. "Courts may properly rely on such statements to determine whether a juror can maintain his or her

impartiality after an incident raising a suspicion of prejudice." (*People v. Harris* (2008) 43 Cal.4th 1269, 1304 (*Harris*).)

Additionally, although White maintains that "the fact the jurors were afraid of [him] revealed they were biased against him," the safety concerns raised here are trivial compared to those our Supreme Court has held did not give rise to juror bias. (See, e.g., *Hamilton*, *supra*, 20 Cal.4th at pp. 283, 284, 306, [finding no bias in a capital murder case where a juror believed the defendant's sister, who testified she was initially involved in the murder scheme, watched the juror from an alley behind the juror's home]; *Harris*, *supra*, 43 Cal.4th at p. 1300 [finding no bias in a capital murder case where the juror's father received a death threat that the juror believed related to the juror's trial].)

Specifically as to Juror No. 7 — about whom White was most concerned — the risk of bias is further ameliorated by the fact that she brought the incident to the court's attention, in part, because she was concerned that *she* had violated the court's order not to interact with the parties or counsel. She was also uncertain about whether White's roommate actually photographed her. (See *Hamilton*, *supra*, 20 Cal.4th at p. 306 [discounting the incident as "brief, isolated, and ambiguous"].) In addition, the trial court offered an innocent explanation for Juror No. 7's initial demeanor when addressing the court.

White contends the jury's Monday morning note asking about jury security indicates the jurors were still afraid of White and therefore biased against him. We disagree. The court told the involved jurors on Friday that it would implement new security protocols. The jury was about to take its lunch break and still had not learned what those protocols were. The jury note was an obvious way to inquire and does not reflect fear or bias.

72

Finally, to the extent the incident arose from White's own conduct in not avoiding jurors and in allegedly smirking at them, no claim of juror bias can "ever be valid where the accused himself had instigated the incident; a party cannot profit by his or her own wrongdoing." (*Hamilton*, *supra*, 20 Cal.4th at p. 305, italics omitted.) In this respect, we note that the trial court warned White's counsel earlier in the case about potential jury or witness tampering after White made a social media post that "put[] three of the victims in this case on blast"[26] when two of them were still subject to recall.

For these reasons, the trial court did not err in denying White's request to remove the involved jurors.

---

[26] The term " 'put on blast' " "colloquially means to subject someone to a barrage of negative internet or real-life social pressure as a result of their actions." (*Wells v. Rice* (E.D.Ky. 2023) 692 F.Supp.3d 735, 744.)

## IV.  DISPOSITION

The judgment is affirmed.  The provision in the clerk's minute order of June 28, 2024 — checking the box next to "no early release of any type authorized" and the handwritten annotations "NO CPAC/NO WORK FURLOUGH" — is ordered stricken.  The clerk of the superior court is ordered to prepare an amended minute order deleting that language.

RUBIN, J.

WE CONCUR:

O'ROURKE, Acting P. J.

BUCHANAN, J.

74